**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

CAROLINE NGANGA-KONGO,                    *

    *Plaintiff*,                                              *

    v.                                                        *          Civil Action No. RDB-24-3449

UNIVERSITY OF MARYLAND                    *
MEDICAL SYSTEM CORPORATION,
                                                              *

    *Defendant*.
                                                              *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**<u>MEMORANDUM OPINION</u>**

In this employment suit, Plaintiff Caroline Nganga-Kongo ("Kongo") claims that her employer, Defendant University of Maryland Medical System Corporation ("UMMS"), violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101–12117, and the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't §§ 20-601 *et seq.*, when it cancelled an elective staffing contract on December 6, 2022, which was the third of series of such contracts. *See generally* (ECF No. 4). Kongo's nine-count Complaint alleges discrimination, retaliation, failure to accommodate, and "interference with medical accommodations" under those statutes. *See generally* (*id.*). In response to each of these claims, UMMS argues that its sole reason for cancelling Kongo's third staffing contract on December 6, 2022, was because of her excessive absences from July through November of that year. (ECF No. 30-1 at 3.) Now pending is UMMS's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 30.) This Court has jurisdiction pursuant to 28

1

U.S.C. § 1331 and § 1367.[1] The Court held a hearing on the Motion on February 20, 2026.[2] (ECF No. 41.) For the reasons set forth on the hearing record (ECF No. 41) and further explained below, UMMS's Motion for Summary Judgment (ECF No. 30) is GRANTED.

## BACKGROUND

"[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## I.    Factual History

### a.  *The "Long-Term Assignment" ("LTA") Staffing System at UMMS*

Defendant University of Maryland Medical System Corporation is a "university-based regional health system" providing healthcare across the State. (ECF No. 30-1 at 5.) During the COVID-19 pandemic, UMMS hospitals experienced significant staffing shortages. (ECF No. 30-3 ¶ 6.) To alleviate the staffing problem, UMMS created the One UMMS Staffing Center. (*Id.*) The Staffing Center functions as an internal staffing agency, assigning UMMS employees to fill vacancies as needed at affiliated hospitals and care centers. (*Id.* ¶ 7.) Employees can be assigned in one of two ways. (*Id.*) The first is on a per diem, or "as needed" basis. (*Id.*) Per diem employees can be assigned to work at different hospitals or care centers as UMMS's needs vary, or they can pick up available shifts. (ECF No. 30-4 at 127.) The second method

---

[1] The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 with respect to Counts One through Seven of Kongo's Complaint, as those claims arise under federal law. The Court exercises supplemental jurisdiction over Counts Eight and Nine, which arise under Maryland law, as those claims are so related to the federal claims that they can be said to form the same "case or controversy." 28 U.S.C. § 1367.

[2] Kongo's counsel appeared telephonically from Hawaii, while counsel for UMMS appeared in Court.

of staffing is through Long-Term Assignment ("LTA") contracts. (ECF No. 30-3 ¶ 7.) The term itself is something of a misnomer, as these agreements last eight to twelve weeks. (*Id.* ¶ 8.) Under an LTA, a UMMS employee is staffed at one hospital—and, normally, within one unit of a hospital—for the entire eight-to-twelve-week contract term. *See* (ECF No. 41). An LTA differs significantly from the per diem staffing model in that it provides both a higher rate of pay and the consistency of a single worksite, *see* (ECF No. 30-3 ¶ 9), in exchange for being subject to, to use Kongo's terms, "strict attendance rules." (ECF No. 34 at 6.) The express language of an LTA states that employees operating under these contracts are expected to work all scheduled shifts and report all unscheduled absences. (ECF No. 30-3 ¶ 9; ECF No. 30-1 at 116, 118, 120–21 (Kongo's LTAs from 2022 to 2023).) To that end, before a UMMS employee signs an LTA, she has an opportunity to make schedule modifications and request time off during the pending contract period. (ECF No. 30-3 ¶ 3.)

Given that the purpose of an LTA is to ensure that UMMS can maintain adequate staffing at its hospitals, UMMS reserves the right to terminate an LTA for an employee's lack of attendance or excessive absences. (ECF No. 30-3 ¶ 9.) UMMS expressly details these requirements and expectations in an LTA's terms. *See generally* (ECF No. 30–4 at 116, 118, 120–21). An LTA includes the employee's acceptance of the requirements: "[b]y signing, I agree to participate in the [Staffing Center]: Long Term Assignment Agreement and all of its requirements as listed." (*Id.* at 117, 119, 122.) In her deposition, Kongo admitted to understanding the scope and potential repercussions of the agreement's attendance

requirements, including the possibility that an LTA could be cancelled for excessive absences.[3] (ECF No. 30-4 at 14–16, 29, 35–36 (Kongo Dep.).)

Once an LTA's contract term begins, attendance is evaluated under the UMMS Attendance Policy, which uses a no-fault "occurrence" system.[4] (ECF No. 30-3 ¶ 11.) While there are multiple types of occurrences under the Policy, only two are relevant to this case: (1) an absence without sufficient sick and safe leave; and (2) an unscheduled absence, including a "call out." (*Id.* ¶ 12.) The Policy includes exceptions for legally protected pregnancy or disability reasons, including exceptions for reasonable accommodations made pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12117. (*Id.*; ECF No. 30-3 at 19.)

### b. *Kongo Worked Under Three Separate, Consecutive LTAs as a Clinical Nurse at St. Joseph Medical Center from May 2022 to December 6, 2022*

Plaintiff Kongo is a Black woman born in Kenya and a resident of Elkton, Maryland. (ECF No. 4 at 1; *id.* ¶ 12.) On May 2, 2022, Kongo was hired by Defendant UMMS as a

---

[3] Specifically, Kongo attested that she was "aware that [an] LTA could be terminated if [she] missed for any reason other than Sick and Safe Leave or self-quarantine or positive test for COVID-19." (ECF No. 30-4 at 36 (Kongo Dep.).)

[4] UMMS's Attendance Policy (ECF No. 30-3 at 18–22) defines the following relevant terms: a "call out" is a "notification to the department that an employee is not able to report to work as scheduled"; an "early out" is a notification to the department manager of an unplanned need to leave prior to the end of a scheduled shift"; an "occurrence" is "an absence that is unscheduled and does not qualify as an Excused Absence"; and, finally, an "excused absence" is "excluded from being counted as an occurrence." (*Id.* at 19.) The following are considered "Excused Absences": (1) approved paid time off; (2) approved leaves of absence; (3) bereavement leave or a death in the family; (4) confirmed jury duty; (5) seminars or other employer approved educational events; (6) worker's compensation absences; (7) scheduled or unscheduled absences for qualifying reasons protected by federal or state law, including but not limited to the Family and Medical Leave Act, Americans with Disabilities Act, the Maryland Fair Employment Practices Act, and the Maryland Healthy Working Families Act; and (8) time off established by other organizational policies, such as policies related to canceled shifts, or suspensions. (*Id.*)

Clinical Nurse II. (ECF No. 30-3 at 42; ECF No. 30-5 ¶ 3.) From May 22, 2022, to December 6, 2022, Kongo worked under three separate, consecutive LTAs. (ECF No. 30-4 at 116–22.) The first LTA began on May 22, 2022, lasted twelve weeks, and ended on August 13, 2022.[5] (*Id.* at 116.) The second LTA began on August 14, 2022, lasted twelve weeks, and ended on November 5, 2022. (*Id.* at 119.) The third LTA began on November 6, 2022. (*Id.* at 122.) That contract was also scheduled to last twelve weeks (the third LTA would have ended on January 28, 2023), *see* (*id.*), but was cancelled on December 6, 2022. (ECF No. 30-1 at 10.)

Under the terms of each of the three LTAs, Kongo worked as a Clinical Nurse II at St. Joseph Medical Center, a constituent hospital of UMMS. (ECF No. 30-4 at 116–22.) Each LTA called for her to work three, twelve-hour shifts per week, totaling thirty-six to forty hours. (*Id.* at 116.) At some point in August 2022, Kongo became pregnant.[6] (ECF No. 34-3 ¶ 1 (Kongo Decl.).) In her declaration, she states that she informed her supervisors of her pregnancy at some point in mid-August 2022. (*Id.* ¶ 9.) On August 14, 2022, the day after the conclusion of her first LTA, Kongo began her second LTA. (ECF No. 30-4 at 118–19.)

On August 16, 2022, the St. Joseph Medical Center Infection Prevention Team notified Kongo that she had been exposed to COVID-19 and directed her to undergo testing. (ECF No. 30-3 ¶ 13.) She tested positive. (ECF No. 30-4 at 47.) Under UMMS policy for COVID-19 at that time, she did not work again until September 5, 2022. (*Id.*) Kongo claims that she experienced COVID-19-induced pulmonary complications and pregnancy related rhinitis.

---

[5] The parties made clear at the hearing on this Motion, that the first LTA is not at issue in this case. (ECF No. 41.)

[6] There is no clear indication in the record when in August 2022 Kongo became pregnant. The first LTA ended August 13, 2022, and the second began August 14, 2022. (ECF No. 30-4 at 116–19.)

(ECF No. 34-3 ¶ 12.) She claims that these conditions were "a result of exposure at work, namely hospital acquired infection." (*Id.* ¶ 1.) Kongo attested at her deposition that she did not notify anyone at UMMS of these conditions until after her third LTA was cancelled on December 6, 2022. (ECF No. 30-4 at 36 (Kongo Dep.).)

On September 13, 2022, Kongo sent an email to Heather Conroy, the Director of Staffing for the One UMMS Staffing Center. (ECF No. 34 at 27.) The email included a note from her doctor, Yelena Lubman, M.D., dated September 13, 2022, which stated: "Due to patient's pregnancy, provider recommends for patient not to work with (1) patients with COVID-19 and (2) patients receiving chemo [sic] treatment." (ECF No. 34-9 at 1; ECF No. 34-2 at 1 (Lubman Note).) The email's subject line was "Accommodation note." (ECF No. 34-9 at 1.) In her Complaint, Kongo claims that this note amounted to a request for accommodation under the Americans with Disabilities Act. (ECF No. 4 ¶¶ 78–97.)

At that time, it was the policy of UMMS that pregnant employees did not care for COVID-19 patients. (ECF No. 30-3 ¶ 14.) Counsel for UMMS indicated at the hearing on this Motion that this policy took effect automatically; pregnant employees did not need to make any request. (ECF No. 41.) As regards chemotherapy, Kongo was not certified to care for patients receiving that treatment. (ECF No. 30-3 ¶ 14.) At the hearing, Kongo's counsel attested that UMMS did not honor these requests in that she was sometimes assigned to care for patients with COVID-19 and had to remind her shift supervisor of her pregnancy. (ECF No. 41.) There is no dispute, however, that Kongo never actually had to care for patients with COVID-19. (*Id.*) Indeed, in her deposition, she attested unequivocally that she did not. (ECF

No. 30-4 at 11.) She also attested that the same was true with respect to chemotherapy patients. (*Id.* at 12–13.)

Just twenty-eight minutes after Kongo emailed Conroy on September 13, 2022, with her doctor's note seeking an accommodation due to her pregnancy, Renelle Hughes, an employee of St. Joseph Medical Center's Employee Health Services team, responded to Kongo. (ECF No. 30-4 at 135.) The email thanked Kongo for sending the doctor's note and asked her to "refer to HR connections to complete and submit an HR request form." (*Id.*) It is undisputed that Kongo did not submit an official request for "[m]odification to work environment," as directed by Hughes, until November 30, 2022.[7] (*Id.* at 55, 137.)

Weeks later, but still during Kongo's second LTA, she missed shifts on October 4, 5, and 7, 2022. (ECF No. 30-3 at 24 (Kongo Absences Records).) She did not provide documentation or details about missing work but instead stated on each instance that she had an illness.[8] (ECF No. 30-4 at 17–18 (Kongo Dep.); *id.* at 35–36 (Kongo Dep.).) Under the UMMS Attendance Policy's no-fault, occurrence-based system, missing a shift for an illness is excused if an employee has accrued sufficient "sick and safe leave"—paid time-off—to cover the shift not worked. *See* (ECF No. 30-3 at 18–22). But, as noted above, if any employee misses

---

[7] Kongo also claims that Conroy never responded to her email of September 13, 2022. (ECF No. 30-4 at 62–63.) UMMS concedes this point, but states that Conroy never saw the doctor's note because of her Outlook settings. (ECF No. 30-1 at 8.) As noted above, however, regardless of Conroy's lack of response, it is undisputed that Kongo did not work with COVID-19 patients or patients receiving chemotherapy after September 13, 2022.

[8] After her third LTA was cancelled for excessive absences on December 6, 2022, Kongo provided what she terms "medical documentation" purporting to explain that her October 2022 absences were "COVID-related." (ECF No. 34 at 10.) It is undisputed—per agreement of counsel for both parties at the hearing of February 20, 2026—that UMMS did not possess such documentation prior to December 6, 2022. (ECF No. 41.)

a scheduled shift without having built up enough sick and safe leave to cover the absence, then that absence is unexcused. (*Id.* at 18–22.) Again, as previously noted, the Policy carves out exceptions to the normal rule for sick-and-safe-leave absences when those absences are otherwise permitted under federal law. (*Id.* at 19.) However, when Kongo missed three shifts in October 2022, she had not alerted UMMS of any disability that would have entitled her to leave. (ECF No. 30-4 at 36.) Her September 13, 2022, accommodation email and doctor's note mentioned only her request to not work with chemotherapy patients and COVID19 patients. (ECF No. 34-9 at 1.) Neither Kongo's email of September 13, 2022, nor the doctor's note attached to it, made requests for leave pursuant to any federal law. (*Id.*)

### c. *Kongo's Third LTA: November 6, 2022, to December 6, 2022*

Kongo's second LTA ended on November 5, 2022. The third LTA began the next day, November 6.[9] (ECF No. 30-4 at 119, 122.) Just as with the first two contracts, Kongo was staffed as a Clinical Nurse II at St. Joseph Medical Center and scheduled to work three, twelve-hour shifts per week for twelve weeks. (*Id.* at 122.) This LTA was slated to end on January 28, 2023. (*Id.*) Unlike the previous LTAs, Kongo requested, in the contract, time off from November 24, 2022, through November 27, 2022—the Thanksgiving Holiday and following

---

[9] Kongo argues that she was subject during her second LTA to "corrective action" from UMMS. (ECF No. 34 at 14.) Her counsel reiterated this argument at the February 20, 2026, motions hearing and claimed that the corrective action caused Kongo to experience a delay in beginning her third LTA. (ECF No. 41.) As regards the supposed "corrective action," Kongo attested at her deposition that she was never subject to any disciplinary action from UMMS except the cancellation of her third LTA on December 6, 2022. (ECF No. 34-11 at 3–4.) At the hearing, UMMS's counsel attested that this notice of corrective action was filed in error and is not reflected in Kongo's personnel file. (ECF No. 41.) There was no delay between the second and third LTA as the second ended on November 5, 2022, and the third began on November 6, 2022. (ECF No. 30-4 at 118–22.)

weekend. (*Id.*) The LTA-contracting process allows employees to make requests for time off at the outset. (ECF No. 30-3 ¶ 10.) Those requests do not count against the employee under the UMMS Attendance Policy. (*Id.*) Kongo admitted during her deposition that, while planning her third LTA with Conroy, she had the opportunity to discuss her September 13, 2022, accommodation request with Conroy but did not do so. (ECF No. 30-4 at (Kongo Dep.).)

Kongo missed work for her scheduled shifts of November 14, 16, and 17, 2022. (ECF No. 30-4 at 25 (Kongo Dep.).) She told supervisors that she could not work because her son was sick. (*Id.* at 26–27 (Kongo Dep.).) Kongo attested in her deposition that she did not provide UMMS with information or documentation containing reasons for her absences until after her third LTA was cancelled on December 6, 2022. (*Id.* at 25–26, 35–36 (Kongo Dep.).) Kongo also missed work on November 23, 2022, and told UMMS that she was sick. (*Id.* at 27 (Kongo Dep.).) She did not provide a note regarding this absence. (*Id.* at 27, 36 (Kongo Dep.).) She had not accrued sufficient sick and safe leave to cover these absences, making them unexcused. (*Id.* at 39 (Kongo Dep.).)

Kongo returned to work for a shift on November 30, 2022. (ECF No. 30-1 at 9.) On the same day, she made an official request through Lincoln Financial for a "[m]odification to work environment." (*Id.* at 9–10.) The record in this case, including statements Kongo made during her deposition, *see* (ECF No. 30-4 at 55), and confirmed by counsel at oral argument, *see* (ECF No. 41), reflects that this formal request process of November 30, 2022, confirmed and made official the original request that Kongo made by email to Conroy on September 13, 2022. *See* (ECF No. 30-1 at 27). Just as with the email of September 13, Kongo's November 30 request through Lincoln Financial sought the accommodation of not treating COVID-19

and chemotherapy patients. (ECF No. 30-4 at 59–60 (Kongo Dep.).) Notably, the November 30 request specifically declined "requesting any time away from work as an accommodation," and that the ability to avoid patients with COVID-19 and those receiving chemotherapy would allow her to "stay[] at work." (*Id.* at 148 (November 30, 2022 Request).) On December 1, 2022, as a direct result of Kongo's request, UMMS Human Resources Business Partner LaShawnda Jacobs emailed Conroy to set up an interactive meeting with Kongo regarding Kongo's requested accommodation. (ECF No. 30-3 ¶ 17.)

**d.** *St. Joseph Medical Center Director of Nursing Operations, Brandon Buckingham, Cancelled Kongo's Third LTA on December 6, 2022*

On December 6, 2022, then-Director of Nursing Operations for St. Joseph Medical Center, Brandon Buckingham, contacted Conroy, head of staffing for the One UMMS Staffing Center, regarding Kongo's unexcused absences from July 2022 to November 30, 2022. (ECF No. 30-5 ¶ 6; *id.* at p. 5.) Buckingham was Kongo's supervisor at St. Joseph Medical Center for each of her three LTAs. (ECF No. 30-4 at 117, 119, 122.) Buckingham told Conroy that he had determined to cancel Kongo's third LTA because she had incurred too many absences. (ECF No. 30-5 ¶¶ 6–7.) Conroy then informed Kongo that her LTA had been cancelled for excessive absenteeism. (*Id.* ¶ 8.) Conroy attested that only after learning of her LTA being cancelled did Kongo tell Conroy that the October and November absences were related to personal and family illnesses for which she could provide documentation. (*Id.*) Despite cancelling the LTA, Conroy offered Kongo the chance to take per diem work through the One UMMS Staffing Center. (*Id.*)

**e.** *Kongo Continued to Work for UMMS After Cancellation of Third LTA*

On December 6, 2022, after Kongo's third LTA was cancelled, she sent a complaint to UMMS Human Resources Business Parter LaShawnda Jacobs stating that her absences in October and November were due to "post covid complications." (ECF No. 30-3 at ¶¶ 18–19(166:3-167:19) (85:3-87:2. 94:11-95:2, 115:5-116:12, 127:4-129:24, 129:5-18, 173:14-174:21 Days later, Kongo submitted documentation explaining her absences, including doctor's notes which purported to excuse the absences. (*Id.* at ¶ 18.) Jacobs investigated but found that Kongo had never disclosed those reasons to anyone at St. Joseph's Medical Center or the One UMMS Staffing Center. (*Id.* ¶ 19.)

On December 15, 2022, Jacobs held an interactive accommodation meeting with Conroy, Kongo, and Lori Wilson, Director of the One UMMS Staffing Center. (ECF No. 30-4 at 70–71; *id.* at 169.) That meeting resulted in UMMS instituting an accommodation plan for Kongo, under which she was not to work with COVID-19 or chemotherapy patients until after she was to give birth in April 2023. (*Id.* at 171–76.) She attested in her deposition that she did not have any issues with her accommodation after the December 15 meeting. (ECF No. 30-4 at 76–77.)

On December 20, 2022, Conroy emailed Buckingham, stating, "[a]fter speaking with [Jacobs] and Lori Wilson, I wanted to reach out to confirm if [St. Joseph Medical Center] would be willing to allow [Kongo] back for an LTA after discussing her accommodation." (ECF No. 30-5 at 5.) Buckingham responded quickly and explained that "[the] decision to end [Kongo]'s LTA had nothing to do with an accommodation – it was related to the volume of callouts she accrued between July and November. At a cost of [eighty-five dollars per hour]

and with an attendance record we would not accept of our team members, I cannot justify keeping her onboard at [St. Joseph's]." (*Id.*)

Despite this, Kongo admitted during her deposition that UMMS offered her a fourth LTA to work at Upper Chesapeake Medical Center, to begin on either January 1 or January 15, 2023. (ECF No. 30-4 at 80 (Kongo Dep.).) Kongo finally began her fourth LTA at Upper Chesapeake on January 29, 2023. (ECF No. 30-4 at 177–80.) Recognizing that Kongo was due to deliver her child in April 2023, that fourth LTA was scheduled to last eight weeks and end on March 25, 2023. (*Id.* at 179.) She was set to work three shifts per week. (*Id.*) The LTA also dictated that Kongo "must not be assigned/care for COVID [sic] or CHEMO [sic] patients," expressly recognizing her accommodation plan. (*Id.*) It further set out that Kongo was not to be scheduled to three consecutive shifts. (*Id.*) Finally, Kongo requested and was given time off on February 6, February 21, March 7, March 14, and March 21, 2023, to attend doctor's appointments for her pregnancy. (*Id.*) Kongo had an emergency delivery on March 7, 2023. (ECF No. 4 ¶ 26.) In her deposition, Kongo affirmed that UMMS provided her with maternity leave, which lasted from March 26, 2023 (the day after the end of her fourth LTA), to July 3, 2023. (*Id.* at 4 (Kongo Dep.).) On July 3, 2023, she began a fifth LTA. (*Id.*) Her counsel attested at the February 20, 2026, hearing on this Motion that Kongo has been continuously employed by UMMS since July 3, 2023, and remains so currently.[10] (ECF No. 41.)

_____

[10] To support multiple claims in her Complaint, Kongo raises a March 2023 First Corrective Warning issued to her by UMMS, which she received on or about April 19, 2023. (ECF No. 4 ¶ 28.) Counsel for UMMS attested in the pleadings and at the hearing of February 20, 2026, that that warning was issued in error and had never been made effective or placed in Kongo's personnel file. (ECF No. 30-1 at 12; ECF 41.) Regardless of that fact, this alleged corrective warning is of no moment. Kongo's claims rise and fall solely with the cancellation of her third LTA on December 6, 2022, and the events surrounding that decision.

## II.    Procedural History

While continuing to work on Long-Term Assignment contracts, on February 13, 2023, Kongo filed an allegation with the Maryland Commission on Civil Rights, claiming that UMMS was engaged in ongoing discrimination and retaliation dating back to August 1, 2022. (ECF No. 4 ¶ 9.) On April 7, 2023, Kongo amended that allegation and submitted formal Charges to the Maryland Commission, cross-filing them with the federal Equal Employment Opportunity Commission.[11] (*Id.*) It is undisputed that on July 11, 2024, Kongo received from the EEOC a Notice of Right to Sue. (*Id.* ¶ 10.)

Kongo filed this nine-count suit against UMMS in the Circuit Court for Baltimore City on October 7, 2024. (ECF No. 4.) Though her Complaint keys on different factual allegations for each count, the core allegation of her lawsuit is that UMMS violated federal and state employment laws when it cancelled her third LTA on December 6, 2022. *See generally* (*id.*). She claims that UMMS's proffered reason of "excessive absenteeism" was merely pretext for various forms of discrimination, retaliation, and failures to accommodate. *See generally* (*id.*). Specifically, Count One alleges sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*[12] (*Id.* ¶¶ 32–40.) Count Two is a disparate treatment sex discrimination claim, predicated on Kongo's pregnancy, again under Title VII. (*Id.* ¶¶ 41–49.) Counts Three and Four are also Title VII claims, but contend that Kongo faced disparate

---

[11] Kongo's Charge with the Maryland Commission on Civil Rights bore case number 2304-0252; the EEOC counterpart bore case number 531-2022-02509.

[12] Kongo labels this claim "gender/sex" discrimination. That is not a relevant distinction under Title VII. The statute uses the term "sex," *see* 42 U.S.C. § 2000e-2(a)(1), but the United States Supreme Court has ruled that "sex," as used in Title VII, includes sex, sexual orientation, and gender identity. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 651–52 (2020).

treatment on the basis of her national origin (Kongo was born in Kenya) and race (she is Black), respectively. (*Id.* ¶¶ 50–58; *id.* ¶¶ 59–68.) Count Five is a Title VII retaliation claim. (*Id.* ¶¶ 69–77.) Count Six arises under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12117 and alleges that UMMS discriminated against Kongo because of her disability and failed to accommodate her. (*Id.* ¶¶ 78–90.) Count Seven is another ADA claim. (*Id.* ¶¶ 91–97.) It, too, claims failure to accommodate, as well as retaliation. (*Id.* ¶¶ 91–97.) Finally, Counts Eight and Nine are state law claims, brought pursuant to the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't §§ 20-601 *et seq.*. (*Id.* ¶¶ 98–108; *id.* ¶¶ 109–15.) Count Eight alleges discrimination based on disability and "interference with medical accommodation." (*Id.* ¶¶ 98–108.) Count Nine alleges retaliation based on disability and "interference with medical accommodation." (*Id.* ¶¶ 109–15.)

UMMS removed the case to this Court pursuant to 28 U.S.C. § 1441 and § 1446, invoking this Court's jurisdiction of 28 U.S.C. § 1331 and § 1367. (ECF No. 1.) It then filed an answer on January 8, 2025. (ECF No. 10.) After discovery had concluded, UMMS filed the pending Motion for Summary Judgment. (ECF No. 30.) The Court heard argument on the Motion on February 20, 2026. (ECF No. 41.)

## STANDARD OF REVIEW

To win summary judgment under Federal Rule of Civil Procedure 56, UMMS must show that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over

a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A party cannot create a genuine dispute of material fact through "mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 141 (4th Cir. 2008). If the moving party has carried its burden of showing that no material fact exists, then the nonmoving party must produce "significantly probative" evidence to avoid summary judgment. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

When considering a motion for summary judgment, a court's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter for resolution at trial. *Anderson*, 477 U.S. at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). This Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312. The Court is not permitted to make credibility determinations at the summary-judgment stage, as that is the role of the fact finder, as is the resolution of all factual disputes. *Tolan v. Cotton*, 572 U.S. 650 (2014). As such, "the plaintiff is entitled to have the credibility of all his evidence presumed." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990)).

## ANALYSIS

As noted above, Kongo's nine-count Complaint brings claims  of discrimination, retaliation, failure to accommodate, and "interference with medical accommodation" under

15

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12117, and the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't §§ 20-601 *et seq. See generally* (ECF No. 41). The Court proceeds by analyzing Kongo's claims of discrimination, then retaliation, then those claims of failure to accommodate. Finally, the Court considers Kongo's Maryland law claims of discrimination and retaliation on the basis of "interference with medical accommodation." *See* (ECF No. 4 ¶¶ 98–108; *id.* ¶¶ 109–15).

> **I.** **Kongo's Claims of Discrimination Under Title VII and the Maryland Fair Employment Practices Act (Counts One–Four, Eight)**

Counts One through Four allege discrimination under Title VII of the Civil Rights Act of 1964. *See generally* (ECF No. 4 ¶¶ 32–68). Specifically, Count One alleges discrimination because of sex; Count Two on the basis of pregnancy; Count Three on the basis of national origin; and Count IV on the basis of race. (*Id.* ¶¶ 32–68.) Count Eight arises under the Maryland Fair Employment Practices Act and alleges discrimination based on disability. (*Id.* ¶¶ 98–108.) Kongo cannot show any dispute of material fact as to any of these claims. Further, as stated on the hearing record (ECF No. 41) and further explained here, the record clearly indicates that UMMS is entitled to summary judgment on all claims of discrimination.

> **a. Legal Standard for Discrimination Claims**

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a); *see Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (setting out Title VII's discrimination standard).

Discrimination claims under the Maryland Fair Employment Practices Act are evaluated under the Title VII standard, including the case law interpreting Title VII. *See Magassouba v. Prince George's Cnty.*, 773 F. Supp. 3d 196, 214–15 (D. Md. 2025); *Passwaters v. Wicomico Cnty.*, No. RDB-18-2923, 2019 WL 6341623, at *8 (D. Md. Nov. 27, 2019). As such, the Court considers Count Eight together with Counts One through Four.

"A plaintiff may prove discrimination through either of two methods: (1) direct evidence of discrimination, or (2) through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (citing *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019)). As Kongo has proffered no direct evidence of discrimination, only the *McDonell Douglas* framework is relevant here. (ECF No. 34 at 17; ECF No. 41.)

The *McDonnell Douglas* framework proceeds in three steps, with the burden of production shifting at each step. *Wannamaker-Amos*, 126 F.4th at 255. The burden of persuasion remains throughout with the plaintiff. *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). At step one, a plaintiff must first make out a prima facie case of discrimination.[13] *Wannamaker-Amos*, 126 F.4th at 255 (citing *Haynes*, 922 F.3d at 223). The burden of proof then shifts to the employer at step two to "articulate a legitimate, non-

---

[13] A prima facie case of discrimination requires a plaintiff to show "(1) that she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021). In claims of race discrimination, the fourth element is often, but not necessarily, reframed as requiring the plaintiff to show the existence of similarly-situated comparators. *See Johnson v. Balt. City*, 163 F.4th 808, 815 (4th Cir. 2026) (internal citation omitted).

discriminatory justification for its allegedly discriminatory action." *Id.* (citing *Haynes*, 922 F.3d at 223). "If the employer carries this burden, the plaintiff must then [at step three] prove by a preponderance of the evidence that the neutral reasons offered by the employer 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Burdine*, 450 U.S. at 253). When a court considers a discrimination claim at the summary-judgment stage, it "bypass[es] analyzing the prima facie case" if a defendant has shown a "legitimate, non-retaliatory justification for its action."[14] *Magassouba*, 773 F. Supp. 3d at 211 (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)); *Mandengue v. ADT Sec. Sys., Inc.*, No. ELH-09-3103, 2012 WL 892621, at *16 (D. Md. Mar. 14, 2012) (collecting Fourth Circuit cases).[15]

At step two of the *McDonnell Douglas* framework, the employer must demonstrate with evidence "a legitimate, non-retaliatory justification for its allegedly discriminatory action." *Wannamaker-Amos*, 126 F.4th at 255 (citing *Haynes*, 922 F.3d at 223). "Once 'an employer articulates a reason for discharging the plaintiff not forbidden by law,' [courts] do not evaluate 'whether the reason was wise, fair, or even correct.'" *Id.* at 257 (quoting *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017)). As such, a defendant does not have to persuade

---

[14] *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). "The core of every Title VII case remains the same, necessitating resolution of 'the ultimate question of discrimination.'" *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295 (4th Cir. 2010) (quoting *Aikens*, 460 U.S. at 714).

[15] Judge Hollander also quotes from a 2008 case from the United States Court of Appeals for the District of Columbia Circuit, *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008), in which then-Judge Kavanaugh explained that "[i]n a [discrimination] suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Id.* at 493–94.

the court that it was "actually motivated by the proffered reason[]." *Burdine*, 450 U.S. at 254. If the employer succeeds in producing a legitimate, non-discriminatory reason, then, at step three of *McDonnell Douglas*, the plaintiff must "produce evidence sufficient to create a material issue of fact" as to whether the employer's reason for taking the adverse employment action was "not its true reason, but rather a pretext for discrimination." *Wannamaker-Amos*, 126 F.4th at 257 (citing *Haynes*, 922 F.3d at 223). A plaintiff can show pretext one of two ways. *Id.* The first is by offering evidence that the employer's neutral justification at step two is "unworthy of credence." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). The second is "adducing other forms of circumstantial evidence sufficiently probative of discrimination." *Id.* (citing *Reeves*, 530 U.S. at 147). If the plaintiff makes either showing of pretext, summary judgment must not be entered. *Id.* (citing *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 652 (4th Cir. 2021)).

As regards the second method of showing pretext, a plaintiff may offer circumstantial evidence that similarly-situated comparators outside the protected class received more favorable treatment. *See Haynes*, 922 F.3d at 223; *Johnson v. Balt. City*, 163 F.4th 808, 815 (4th Cir. 2026) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)). To be a valid comparator, "[a] plaintiff must produce evidence that the plaintiff and comparator 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haynes*, 922 F.3d at 223–24 (quoting *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (unpublished)). While the similarities between a comparator and the plaintiff need not be one-to-one, there must be "'sufficient

commonalities on the key variables between'" them, "'clearly established'" by record evidence, to create a triable issue of fact for a jury. *Johnson*, 163 F.4th at 815 (first quoting *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017) (unpublished), then quoting *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008)).

### b. Application

As noted above, the Court assumes without deciding that Kongo has demonstrated a prima facie of discrimination in each of Counts One through Four and Count Eight. Each of these five claims alleges that UMMS discriminated against Kongo when it cancelled her third LTA on December 6, 2022. (ECF No. 4 ¶¶ 32–68, 98–108). At *McDonnell Douglas* step two, UMMS has to show—with evidence—a legitimate, non-discriminatory justification for cancelling Kongo's third LTA. *Wannamaker-Amos*, 126 F.4th at 255 (citing *Haynes*, 922 F.3d at 223). It is well settled that poor attendance and excessive absenteeism are legitimate, non-discriminatory reasons for an employee to take an adverse employment action against an employee. *See, e.g.*, *Dachman v. Shalala*, 9 F. App'x 186, 190 (4th Cir. 2001) (unpublished); *Dallas v. Giant Food*, 187 F. Supp. 2d 505, 510 (D. Md. 2002); *Eldridge v. Northrop Grumman Corp.*, 81 F. Supp. 2d 600, 601 (D. Md. 1999); *Cunningham v. Owens-Ill., Inc.*, 669 F. Supp. 757, 763 (S.D. W. Va. 1987).

UMMS's proffered non-discriminatory reason for ending Kongo's third LTA is that she "accrued too many unplanned and unexcused absences" from July to November 2022. (ECF No. 30-1 at 22.) Kongo's attendance record shows that she missed her shifts on October 4, 5, and 7, 2022, all during her second LTA. (ECF No. 30-3 at 24.) During her third LTA, she missed work on November 14, 16, 17, and 23, 2022. (*Id.* at 24.) UMMS's stated reason is

20

corroborated by the December 20, 2022, email from Brandon Buckingham, the Director of Nursing at St. Joseph Medical Center and Kongo's supervisor for her first three LTAs, to Conroy, Director of Staffing for the One UMMS Staffing Center. (ECF No. 30-5 at 5.) In that email, Buckingham noted that the decision to end Kongo's third LTA "was related to the volume of callouts she accrued in July and November. At a cost of [eighty-five dollars per hour] and with an attendance record we would not accept of our team members, I cannot justify keeping her onboard." (*Id.*) UMMS has met its burden at *McDonnell Douglas* step two.

At step three, Kongo bears the burden of producing evidence that sufficiently demonstrates that UMMS's given reason for cancelling the third LTA was pretextual. *Wannamaker-Amos*, 126 F.4th at 257 (citing *Haynes*, 922 F.3d at 233). Put plainly, Kongo has produced no evidence to overcome her burden at this final step of *McDonnell Douglas*. She has not shown that UMMS's given reason—excessive absenteeism—is unworthy of credence. Indeed, UMMS has been remarkably consistent in this respect. From its internal communications, including the December 20, 2022, email from Brandon Buckingham noted above, *see* (ECF No. 30-5 at 5), to its responses to Kongo's interrogatories during discovery in this case, *see* (ECF No. 30-6 at 15), to its briefing, *see* (ECF No. 30-1 at 3), and statements to the Court during the hearing on this Motion for Summary Judgment, *see* (ECF No. 41), UMMS has only ever had one justification for cancelling Kongo's third LTA: her absences from work from July to December 2022.

Similarly, Kongo has not adduced any circumstantial evidence, including that of similarly-situated comparators, to create a triable issue of fact on discrimination. Kongo's declaration, prepared for this case, lists five supposed comparators. (ECF No. 34-3 ¶¶ 36–40.)

21

They are: Julie Chehanske, a White, American woman who took medical leave and requested an accommodation that was allegedly approved, but who did not have her contract cancelled (*id.* ¶ 36); Marshal Fulton, a Black American man, who did not have his LTA cancelled (*id.* ¶ 37); Janet Ameho, an American, non-Kenyan, non-pregnant woman, who did not have her contract cancelled (*id.* ¶¶ 38–39); Bridget Kenah and Jennifer Oberdick, non-Kenyans who did not have their contracts cancelled (*id.* ¶ 39); and Sally Jusu, a pregnant woman not suffering from complications related to COVID-19, who was not denied temporary reassignment, and who worked at St Joseph's Medical center and was "treated better." (*Id.* ¶ 40.) Kongo has not produced specific, record evidence as to any of these persons. All that exists in the record is Kongo's own declarations as to each of them. The Court has listed the descriptions of those other UMMS employees as they appear in the declaration. There is simply no factual record from which any trier of fact could find that there is a genuine issue of material fact as to how those supposed comparators may or may not have been treated by UMMS.

These descriptions lack sufficient material from which the Court could even determine that these supposed comparators were similarly situated. Moreover, a plaintiff's self-serving declaration is, by itself, insufficient as a matter of law to establish pretext at the third step of *McDonnell Douglas*. *See Ramos v. Molina Healthcare, Inc.*, 963 F. Supp. 2d 511, 525 (E.D. Va. 2014), *aff'd*, 603 F. App'x 173 (4th Cir. 2015) ("[A] plaintiff may not simply allege that the employer's stated reasons were inaccurate without also tethering (or enabling the court to tether) the employer's decision to the discriminatory reasons."). Even more fatal to Kongo's claims of being treated less favorably than her supposed comparators, however, is that her own declaration says *nothing* about whether these UMMS employees had excessive, unexcused

absences. Indeed, besides oblique references to certain of those persons taking medical leave, there are no references whatsoever in the declaration to attendance in the first place. As such, the declaration simply fails to create valid comparators necessary to establish pretext. Therefore, because Kongo has not provided the Court with any record evidence to create a triable issue of fact on pretext and discrimination, she has failed to meet her burden at step three of *McDonnell Douglas.* Accordingly, this Court GRANTS summary judgment to UMMS on Counts One through Four and the discrimination claim in Count Eight.

## II. Kongo's Retaliation Claims Under Title VII, the ADA, and the Maryland Fair Employment Practices Act (Count Five, Seven, Nine)

In Counts Five, Seven, and Nine, which arise under Title VII, the ADA, and the Maryland Fair Employment Practices Act, respectively, Kongo alleges retaliation by UMMS. (ECF No. 4 ¶¶ 69–77, 91–97, 109–15.) As the Court noted on the record (ECF No. 41), there is no material fact dispute as to these claims. UMMS is entitled to summary judgment on each.

Courts apply the same burden-shifting framework from *McDonnell Douglas* to claims of retaliation.[16] *Johnson*, 163 F.4th at 819 (citing *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015)). Furthermore, the analysis is the same whether under Title VII, the ADA, or the Maryland Fair Employment Practices Act. *See Barreto v. SGT, Inc.*, 826 F. App'x 267, 271 (4th Cir. 2020) (applying these elements to both federal law and Maryland law together); *Kasmir v. Retail Servs. & Sys., Inc.*, 330 A.3d 755, 773–74 (Md. Ct. App. 2025) (applying *McDonnell Douglas* to retaliation claims under the Maryland Fair Employment Practices Act). Therefore,

---

[16] Unlike in discrimination claims, however, when considering retaliation claims, courts do not jump past the prima facie case to step two of *McDonnell Douglas. See Mandengue*, 2012 WL 892621, at 26.

at step one, to make out a prima facie case under any of these statutes, a plaintiff must show that (1) she engaged in protected activity; (2) the defendant took a materially adverse employment action against the plaintiff; and (3) but for the protected activity, the defendant would not have taken the adverse action. *Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018) (quoting *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008)). If, and only if, the plaintiff can demonstrate the existence of a prima facie case, the Court proceeds with the standard second and third steps of *McDonnell Douglas. Foster*, 787 F.3d at 249.

Though similar in many respects, retaliation claims under Title VII and corollary employment statutes differ materially from discrimination claims with respect to the causation standard. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Whereas discrimination claims have a "lessened causation standard," *see Foster*, 787 F.3d at 249, "retaliation claims must be proved according to the traditional principles of but-for causation." *Nassar*, 570 U.S. at 360. "This requires *proof* that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* (emphasis added). Crucially, "[a] plaintiff claiming retaliation must establish that the employer had knowledge of the protected activity." *Shields v. Fed. Express Corp.*, 120 F. App'x 956, 962 (4th Cir. 2005) (unpublished).

In this case, UMMS argues that Kongo's retaliation claims fail because she cannot show any adverse action, and, similarly, cannot meet the higher but-for causation standard. (ECF No. 30-1 at 29.) Assuming without deciding that Kongo can show both the existence of a protected activity and that UMMS took an adverse employment action, summary judgment is still proper here because Kongo cannot show but-for causation. The record in this case clearly

indicates that Brandon Buckingham, the Nursing Director at St. Joseph Medical Center, was the final decisionmaker with respect to cancelling Nganga-Kongo's third LTA. It also shows that he was not aware of the September 13, 2022, accommodation request, nor the November 30, 2022, submission of that request to Lincoln Financial. (ECF No. 30-4 at 73 (Nganga-Kongo Dep.).) Nganga-Kongo has produced no evidence to prove but-for causation of the type required by the Supreme Court in the *Nassar* case. *See Nassar*, 570 U.S. at 360. A plaintiff must have *proof* that any adverse action would not have happened except for or without the protected activity. *Id.* Just as for the discrimination claims, Kongo has no proof of any kind that the cancellation of her LTA was caused by any protected activity. At the hearing on this Motion (ECF No. 41), Kongo's counsel attempted to argue that, because Conroy was aware of Kongo's accommodation request, and because she and Buckingham were in communication, that therefore Buckingham must have known of the September 13 request. Such inferential chains, wrought without any substantive record evidence to corroborate them, do not suffice to meet the but-for causation standard necessary for retaliation claims. As such, the Court GRANTS summary judgment to UMMS on the retaliation claims in Counts Five, Seven, and Nine.

### III.   Kongo's Failure-to-Accommodate Claims Under the ADA (Counts Six and Seven)

In Counts Six and Seven, Kongo asserts that UMMS violated the Americans with Disabilities Act of 1990 by failing to accommodate her disabilities. (ECF No. 4 ¶¶ 78–90, 91–97.) She claims that she made a reasonable accommodation request on September 13, 2022, by sending Heather Conroy, Director of Staffing for the One UMMS Staffing Center, an email with a doctor's note attached. (ECF No. 34 at 27.) As previously noted, that doctor's note

requested that, because of Kongo's pregnancy, she not be assigned to care for patients with COVID-19 or patients receiving chemotherapy treatment. (ECF No. 34-2 at 1 (Lubman Note).) Kongo claims that UMMS failed to respond to her request and did not engage with her in the interactive accommodation process set out by the ADA. (ECF No. 34 at 27.) She argues that UMMS did not accommodate her request until January 29, 2025. (*Id.* at 27–28.) Kongo's claims fail for at least two reasons. First, Kongo's alleged request for accommodation in the Complaint is based on her September 13, 2022, email to Conroy, asking to be permitted not to treat two types of patients because of her pregnancy. Pregnancy is not a disability under the ADA, meaning that, as a matter of law, UMMS cannot have failed to accommodate any disability. Second, and in the alternative, even if the Court were to disregard the fact that pregnancy is not a disability recognized by the ADA, there is no genuine issue of material fact regarding any failure to accommodate on the part of UMMS. It is therefore entitled to summary judgment on these claims.

Under the Americans with Disabilities Act of 1990, an employer is prohibited from "discriminat[ing] against a qualified individual on the basis of disability . . . ." 42 U.S.C. § 12112(a). "Such unlawful discrimination can include the failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013) (quoting 42 U.S.C. § 12111(8)). The Maryland Fair Employment Practices Act is the state analog to the ADA, and so courts treat failure-to-accommodate claims under the ADA and Maryland law as "coterminous." *Jenkins v. Univ. of Md. Cap. Region Health*, No. BAH-22-3108, 2025 WL 937606, at *9 n.15 (D. Md. Mar. 27, 2025) (internal

26

citation omitted). Therefore, to state a prima facie case of failure to accommodate under either Maryland law or the ADA, a plaintiff must establish that (1) she is an individual with a disability within the meaning of the statute; (2) her employer had notice of the disability; (3) that with reasonable accommodation she could perform the essential functions of her role; and (4) that the employer refused to make the accommodations. *Wilson*, 717 F.3d at 345. Pregnancy alone is not a disability recognized by the ADA. *Wenzlaff v. NationsBank*, 940 F. Supp. 889, 890 (D. Md. 1996) ("With near unanimity, federal courts have held that pregnancy is not a 'disability' under the ADA."); *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 488 (D. Md. 2013) (internal citations omitted); *EEOC v. Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d 89, 104 (D. Md. 2019).

Kongo's Complaint alleges that she made a valid accommodation request pursuant to the ADA on September 13, 2022, when she sent Heather Conroy an email with the subject line, "Accommodation note." (ECF No. 4 ¶ 83.) Attached to that email was a doctor's note recommending that, "due to [Kongo's] pregnancy," she be permitted not to treat patients with COVID-19 and those receiving chemotherapy. (ECF No. 34-9 at 1.) As pregnancy is not a valid disability under the ADA, Kongo's claims fail as a matter of law. She cannot meet the first element of an ADA failure-to-accommodate claim. Therefore, UMMS is entitled to summary judgment on Counts Six and Seven.[17]

---

[17] At the motions hearing of February 20, 2026, Kongo's counsel argued that she has a valid ADA disability in that she suffers from pregnancy-related conditions. (ECF No. 41). While pregnancy-related conditions are cognizable disabilities under the ADA, *see EEOC v. Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d at 104–05, this claim is not found in the Complaint (ECF No. 4). "[P]arties cannot amend their complaints through briefing or oral advocacy." *S. Walk at Broadlands Homeowners Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184–85 (4th Cir. 2013) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984);

In the alternative, even if the Court were to find that Kongo had made a valid accommodation request under the ADA, UMMS would still be entitled to summary judgment because there is no genuine dispute of material fact that Kongo's request of September 13, 2022, was honored. Once an employee makes a request for an accommodation under the ADA, the statute "contemplate[s] that the employer will pursue an 'informal, interactive procss' with its disabled employees to ascertain the extent of their disabilities and the range of accommodations that might address them." *Kelly v. Town of Abingdon*, 90 F.4th 158, 166 (4th Cir. 2024) (quoting *Wilson*, 717 F.3d at 346). As a rule, however, no failure-to-accommodate claim can lie where the employer provided the requested accommodation, even if it did so informally and without engaging in the interactive process. *See Gooding v. SYKES Enter., Inc.*, No. PX-20-3292, 2023 WL 2023211, at *5 (D. Md. Feb. 15, 2023). As this Court has previously noted, "an employee cannot prevail [on a failure-to-accommodate claim] simply by demonstrating that [her] employer failed to engage in the interactive process; [s]he must also show that this failure to engage in the process resulted in the failure to find an appropriate accommodation." *Fleetwood v. Harford Sys. Inc.*, 380 F. Supp. 2d 688, 701 (D. Md. 2005) (internal citation omitted).

In this case, there is simply no question that Kongo was not required to take care of patients with COVID-19 or those receiving chemotherapy after September 13, 2022. (ECF No. 30-1 at 25–26.) As the Court has already noted, Kongo testified to that effect during her deposition. (ECF No. 30-4 at 11–13.) Kongo has not introduced any record evidence that to

---

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 449 (4th Cir. 2011)). Therefore, Kongo's assertions as to pregnancy-related disabilities are moot.

counter her own sworn deposition testimony. Therefore, she has failed to carry her burden at the summary-judgment stage of putting forth facts which would create a genuine dispute and create a triable issue of fact for a jury. In sum, UMMS is entitled to summary judgment on the failure-to-accommodate claims because Kongo did not allege in the Complaint (ECF No. 4) that she had any disability recognized by the ADA. Further, and in the alternative, she has not produced any evidence creating a genuine dispute as to the fact that UMMS honored her request not to work with chemotherapy patients and those diagnosed with COVID-19. As such, the Court GRANTS summary judgment to UMMS on the failure-to-accommodate claims in Counts Six and Seven.

**IV.  Kongo's "Interference with Medical Accommodation" Claims Under the Maryland Fair Employment Practices Act (Counts Eight and Nine)**

In Counts Eight and Nine, which supposedly arise under the Maryland Fair Employment Practices Act, Kongo claims that UMMS violated Maryland law through its "interference with medical accommodations." (ECF No. 2 ¶¶ 98–108, 109–15.) The Court has found only one case that evaluates such a claim: *Mack v. Md. Dep't of Hum. Servs.*, No. DLB-23-1577, 2024 WL 580672, at *7 (D. Md. Feb. 13, 2024). Notably, the plaintiff's counsel in that case is also Kongo's counsel here. *Id.* at *1. Judge Boardman of this Court ruled that the "interference with medical accommodations" claim is not a cognizable cause of action under the Maryland Fair Employment Practices Act. *Id.* at *7. That decision further explained:

> The statute's text does not provide for a claim of interference with medical claim. Mack cites no authority for the notion that the statute covers this claim. And the Court has not found any. The Maryland Supreme Court's most recent survey of the protections the MFEPA provides people with disabilities does not mention it.

*Id.* Here, Kongo's Response in Opposition similarly provides no argument persuasive enough to read a cause of action into the statute. (ECF No. 34 at 35–36.) Indeed, her only argument—which she makes without any statutory interpretation analysis and without pointing to any caselaw to justify the theory—is that the protections of the Americans with Disabilities Act naturally create this cause of action under Maryland law. (*Id.* at 35–36.) When pressed on this theory at the hearing on this Motion, Kongo's counsel provided no argument in support of the viability of this cause of action. (ECF No. 41.) The Court GRANTS summary judgment to UMMS on the "interference with medical accommodation" claims in Counts Eight and Nine as such claims do not exist under the Maryland Fair Employment Practices Act.

## CONCLUSION

For the reasons stated on the record at the hearing of February 20, 2026 (ECF No. 41), and further explained above, UMMS's Motion for Summary Judgment (ECF No. 30) is GRANTED.

A separate Order follows.

Date: April 1, 2026

/s/
Richard D. Bennett
United States Senior District Judge